NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

---

DECORATION DESIGN SOLUTIONS, : 
INC., :
 :
        Plaintiff, :     Civil No. 20-2667 (RBK/JS)
 :
        v. :     **OPINION**
 :
AMCOR RIGID PLASTIC USA, INC., et :
al., :
 :
        Defendant. :

---

**KUGLER**, United States District Judge:

    Presently before the Court is Defendant Amcor Rigid Packaging USA's ("Amcor") Motion to Dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(6), or alternatively, Motion to Transfer this action pursuant to 28 U.S.C. § 1404(a) to the United States District Court for the Eastern District of Michigan. (Doc. No. 18). Also, before this Court are Defendant Amcor and Plaintiff Decoration Design Solutions, Inc.'s ("DDS") Motions to Seal. (Doc. No. 20, 25). For the reasons set forth below, Defendant's Motions are **GRANTED**, and Plaintiff's Motion is **GRANTED**.

**I.    BACKGROUND**

    The crux of the current dispute is the scope of a forum selection clause in an Asset Purchase Agreement ("APA"). If the contract DDS is suing under, the 2016 Agreement, falls within the scope of the forum selection clause, the case must be transferred to the Eastern District of Michigan. However, if the 2016 Agreement escapes the bounds of the forum selection clause, transfer is not warranted, and this action is properly before the Court. To put this issue in its proper

1

context, we set forth the applicable contracts, their provisions, and the surrounding circumstances. However, because both parties move to seal the contracts, the applicable provisions will be mentioned only in general terms.

### A. Factual Background

Plaintiff DDS, a New Jersey corporation, primarily provides retail and industrial contract decoration services—such as pressure sensitive, hot stamp, and heat transfer printing on supplied containers—to the pharmaceutical and personal care industries. (Doc. No. 11, Am. Compl. at ¶ 6). Defendant Amcor, a Delaware LLC, manufactures rigid plastic containers used by various industries, including the personal care and pharmaceutical industries. (*Id.* at ¶ 7).

Throughout 2015 and 2016, there were ongoing negotiations between the President of DDS, Steven Wargo, and Amcor representatives about a potential business transaction involving the manufacture and sale of a custom rigid "injection mold" plastic tube. (*Id.* at ¶ 8). During the course of these negotiations, Amcor allegedly represented that it had "reversed engineered" a comparable product sold in the European pharmaceutical and personal care market. (*Id.* at ¶ 9). Amcor also allegedly represented that the product, as reflected in engineering drawings, would match the sample of the European model and be sufficient to serve its intended purpose in the hands of DDS's customers. (*Id.* at ¶ 10).

Even though there were ongoing negotiations between DDS and Amcor, on May 1, 2015, they entered into a preliminary Memorandum of Understanding ("2015 MOU") under which Amcor agreed to manufacture, and DDS to purchase, the subject longneck tube product. (Doc No. 23, Plaintiff's Brief in Opposition, at 2). The 2015 MOU contained a conflicts of law provision, requiring the provision of the MOU to be construed in accordance with Michigan law, and a forum

selection clause mandating that the parties submit to the jurisdiction of the state and federal courts of Michigan. (Doc. No. 19).

Prior to the shipment of the product, on March 1, 2016, Amcor submitted a written price quotation to DDS along with an accompanying "Standard Terms and Conditions of Sale." (Doc. No. 23, Exhibit A). The "Standard Terms and Conditions of Sale" ("2016 Agreement") contained a conflict of law provision but no forum selection clause. (*Id.*). It also provided that it superseded any prior agreements or understandings and constituted the entire understanding between the parties with respect to the subject longneck tube product. (*Id.*).

Thereafter, Amcor manufactured and shipped 8.5 million units of the product to DDS pursuant to the terms of the price quotation (Doc. No. 11, Am. Compl. at ¶ 13). Upon receipt, DDS decorated the product by affixing its commercial identifiers and shipped it to customers. (*Id.*). Sometime after the delivery of the 2016 product, DDS was informed by its customers that the product leaked or its tip would break off prematurely. (*Id.* at ¶ 14). Customers of DDS began to reject the product and refused to pay for it. (*Id.*). DDS notified Amcor of the alleged product defect. (*Id.*).

In response to notification of the alleged product defect, Amcor conducted subsequent testing. (*Id.* at ¶ 15). It is averred the testing revealed that the plastic resin used in the manufacturing process was not flowing into the injection mold evenly and it was not the same type of resin used in the European model. (*Id.* at ¶ 15, 16). Amcor attempted to modify the design in order to remedy the issue. (*Id.* at ¶ 17). After this modification was implemented, Amcor produced additional quantities of the revised product. (*Id.*). DDS then shipped this modified product to two of its major customers free of charge. (*Id.* at ¶ 18). The modified product still exhibited the same alleged

3

deficiencies as the original when used by DDS's customers. (*Id.* at ¶ 19). DDS advised Amcor that the modified product failed to remedy the original issues. (*Id.* at ¶ 20).

At some point during their contractual relationship, Amcor began to withhold money it owed DDS under a separate contract because Amcor had not been paid in full on its invoices for the manufacture of the subject long neck tube. (*Id.* at ¶ 22). Under this separate contract, the parties were in opposite positions—DDS was providing bottlecap decoration services to Amcor for aspirin bottle caps and Amcor was the purchaser of the services. (*Id.*). This separate contract included a choice of law provision and forum selection clause as well. (Doc. No. 18, Exhibit B).

To close out the parties' contractual relationship, on September 24, 2019, they entered into an Asset Purchase Agreement ("APA"). (Doc. No. 27, Def. Reply Brief). Amcor, DDS, and Enemeez, Inc., a customer of DDS, were all parties to the APA. Its purpose was two-fold: (1) the sale of Amcor's assets to Enemeez in satisfaction of the money DDS owed to Amcor for the manufacture of the subject long neck tube product; and (2) the release of any claims DDS or Amcor had against each other arising out of their contractual relationship with respect to the product. (Doc. No. 19, Exhibit D). The APA contained a choice of law provision and a forum selection clause. The forum selection clause provided "[a]ll disputes arising out of or relating to this Agreement will be subject to the exclusive personal jurisdiction and venue of the federal courts of the State of Michigan to which the Parties irrevocably submit." (Doc. No. 19, Exhibit D).

On February 13, 2020, DDS filed a complaint against Amcor in the Superior Court of New Jersey alleging it breached express warranties, the implied warranty of merchantability, and fitness for a particular purpose with respect to its contractual obligations for the subject long neck tube product. (Doc. No. 1, Exhibit A). Amcor subsequently removed the action to this Court on March 11, 2020, on the basis of diversity of citizenship jurisdiction. (Doc. No. 1).

## II.  LEGAL STANDARD

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

The Third Circuit had held that a forum selection clause may be enforced under a 12(b)(6) standard. *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d 289, 299 (3d Cir. 2001) ("[A] 12(b)(6) dismissal is a permissible means of enforcing a forum selection clause . . . ").

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss an action for failure to state a claim upon which relief can be granted. When evaluating a motion to dismiss, "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). In other words, a complaint survives a motion to dismiss if it contains enough factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

To make this determination, courts conduct a three-part analysis. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the Court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the Court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 680). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Iqbal*, 556 U.S. at 678). Finally, "when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). A complaint cannot survive a motion to dismiss where a court can only infer that a claim is merely possible rather than plausible. *Id.*

### i. Four Corners Doctrine and Its Exceptions

Federal Rule of Civil Procedure 12(b) specifically circumscribes material that a court may consider to dismiss by stating "if, on a motion asserting the defense number (6) to dismiss, . . . matters outside the pleading are presented and not excluded by the court, the motion shall be treated as one for summary judgment." As such, a court generally may not "consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). One exception to this general rule is when documents are integral to the complaint.

### 1. Documents Integral to the Complaint

One of the exceptions to the four corners doctrine allows a court to consider documents that can be considered integral to the referencing complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). Integral documents are defined as documents which create rights or duties that are the basis for the Complaint. *In re Merck Co., Inc., Sec., Derivative & "Erisa" Litig.*, No. CV 05-1151 (SRC), 2006 WL 8460903, at *2 (D.N.J. Jan. 20, 2006). Put differently, this exception encompasses situations where the Plaintiff's claim depends on the contents of a document. *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014). The quintessential example of this exception is a breach of contract action; in such cases, the contract would be considered integral and a defendant filing a motion to dismiss under 12(b)(6) would be permitted to attach the contract as an exhibit, which would then be considered for its truth by the court. . *In re Merck Co., Inc., Sec., Derivative & "Erisa" Litig.*, No. CV 05-1151 (SRC), 2006 WL 8460903, at *2 (D.N.J. Jan. 20, 2006).

In resolving the current motion, the Court shall consider the 2015 MOU, the 2016 Agreement, and the APA. The first two agreements created the relationship between the parties from which this action arose, and the last agreement directly implicates whether Plaintiff has valid

6

contract claims. Thus, these documents are integral to the allegations pleaded in the Complaint and the Court will rely on them in deciding the Motion to Transfer.

### B. Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)

28 U.S.C. § 1404(a) provides that "[f]or the convenience of the parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." It is well settled that a motion to transfer under § 1404(a) constitutes the appropriate procedural mechanism to enforce a forum selection clause. *See Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63, 134 S. Ct. 568, 581, (2013). However, as a threshold matter, the Court must first examine the enforceability of the forum selection clause, prior to engaging in a transfer analysis.

### C. Local Civil Rule 5.3

Local Civil Rule 5.3 governs all motions to seal or otherwise restrict public access to both materials filed with the Court and judicial proceedings themselves. L. Civ. R. 5.3(a)(1). Under Rule 5.3(c)(2), a party seeking an Order to seal materials or judicial proceedings must describe: (a) the nature of the materials or proceedings at issue; (b) the legitimate private and public interests which warrant the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; and (d) why a less restrictive alternative to the relief sought is not available. L. Civ. R. 5.3(c)(3).

There is a strong presumption in favor of public access to judicial proceedings and records. *See In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). To overcome this presumption, "good cause" must be established for the protection of the material at issue. *Opperman v. Allstate New Jersey Ins. Co.*, No. CIV. 07-1887 (RMB/JS, 2009 WL 3818063, at

7

*8 (D.N.J. Nov. 13, 2009). If a document contains both confidential and non-confidential information, the movant must submit a copy of the document with proposed redactions of information as well as an unredacted version of the document. L. Civ. R. 5.3(c)(3).

## III. DISCUSSION

Defendant Amcor contends DDS's contract claims are subject to the forum selection clause in the APA and therefore they must be dismissed under 12(b)(6) or transferred pursuant to § 1404(a) to United States District Court for the Eastern District of Michigan.

Plaintiff DDS maintains its contract claims are governed by the 2016 Agreement, which contains only a choice of law provision, and therefore its suit was properly filed in New Jersey. DDS argues in the alternative that even if its contract claims are governed by the 2015 MOU, the forum selection clause in that contract is permissive rather than mandatory and as such Amcor's motion should be denied.

The parties dispute both the enforceability and the scope of the forum selection clause. Each issue will be addressed in turn.

### A. Scope of Forum Selection Clause

Disagreement over the scope of a forum selection clause—whether it extends to a particular dispute—is governed by state law. *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018). This is so because the intended scope of a clause is not a procedural issue but a substantive question of contract interpretation. *Id.* However, when the parties fail to address the choice of law issue in their briefs and rely on cases that apply different bodies of law than that designated in the contract, as is the case here, the issue is waived. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 99 (3d Cir. 2018) (concluding the parties waived the choice of law issue because they failed to address it in their briefs and relied on cases that applied

8

different law than the choice of law clause in the broker-dealer agreement); *see Williams v. BASF Catalysts LLC*, 765 F.3d 306, 316–17 (3d Cir. 2014) (holding choice of law questions can be waived by the parties failure to litigate the issue because it does not go to the courts power to hear a case); *see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (basing its decision on general contract principles even though the contract provided it was to be governed by "English law" as the parties briefing did not rely on any distinctive feature of English law).

Neither DDS nor Amcor have addressed the choice of law issue in their respective briefs despite every contract providing that it will be "construed according to the internal laws of the State of Michigan." Nor have they relied on any distinctive features of Michigan or New Jersey law to come to their conclusions. In fact, DDS does not cite a single case for its argument that the dispute is outside the scope of the forum selection clause and Amcor relies only on federal precedent. Accordingly, we deem the choice of law issue to be waived and will base our decision on general contract law principles.

### i. Application of General Contract Law Principles

As with any contract provision, we must begin with the text of the contract to determine whether it unambiguously states the parties' intentions. "To be unambiguous, a contract clause must be reasonably capable of only one construction." *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1074 (3d Cir.1997). The dispute here is over the meaning of the phrase "arising out of or relating to" in the APA's forum selection clause.

To "arise" out of means "to originate from a specified source." Webster's Third New International Dictionary 117 (1986); *see also* Black's Law Dictionary 102 (11th ed. 2019) (defining "arise" as "1. To originate; to stem (from) . . . 2. To result (from)"). The phrase "arising out of" is

9

usually interpreted as requiring a causal connection that is more than incidental. *Altman Mgmt. Co. v. AON Risk Ins. Servs. W., Inc.*, No. 328593, 2016 WL 5122109, at *8 (Mich. Ct. App. Sept. 20, 2016) (noting term "'arising out of' does not mean proximate cause in the strict legal sense ," rather it has been interpreted to mean "originated from" or "growing out of."); *Westchester Fire Ins. Co. v. Cont'l Ins. Companies*, 126 N.J. Super. 29, 38, 312 A.2d 664, 669 (App. Div. 1973), aff'd, 65 N.J. 152, 319 A.2d 732 (1974) (construing the phrase "arising out of" to mean "originating from," "growing out of," or having a "substantial nexus."). This interpretation comports with the Third Circuit's decision in *Reading Health System*. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 98 (3d Cir. 2018).

In *Reading Health System*, the dispute centered on whether Reading's action to compel arbitration fell within the scope of a forum selection clause that provided "all actions and proceedings arising out of this Broker-Dealer Agreement . . . shall be brought in the United States District Court in the County of New York." *Id.* After Reading's business relationship with J.P. Morgan soured, it filed a statement of claim with FINRA seeking to arbitrate its claims against J.P. Morgan. *Id.* at 92. J.P. Morgan refused to arbitrate, arguing the District Court was required to transfer the case because the petition to compel arbitration is an action "arising out of" the broker-dealer agreements. *Id.* In response, Reading filed a declaratory judgment action in the District Court for the Eastern District of Pennsylvania and moved to compel arbitration. *Id.* Reading won at the trial court level, and J.P. Morgan appealed. *Id.* The Third Circuit construed the phrase "arising out of" in accordance with its ordinary meaning—i.e. to originate from a specified source. *Id.* at 99. With the meaning of this phrase firmly established, the Court turned to crux of the issue: was Reading's declaratory judgment action to compel arbitration an action or proceeding that *originated from* the broker-dealer agreements. *Id.* No, it was not. *Id.* The Court reasoned Reading's

10

claim for declaratory relief did not arise out of the broker-dealer agreements because the claim did not involve an assertion of its contractual rights or duties. *Id.* Rather, Reading's right to arbitrate arose from FINRA Rule 12200, which gave it the right to demand FINRA arbitration. *Id.*

The propriety of the current transfer action turns on the answer to the following question: Are DDS's contract claims a dispute that *originated from* the APA. No, they are not. DDS's claims for breach of express warranty, implied warranty of merchantability, and fitness for a particular purpose do not arise out of the APA because the APA did not give DDS the right to have a product of comparable quality to that which Amcor allegedly represented it would provide. Rather, it was the 2015 MOU, the 2016 Agreement, and Amcor's alleged representations prior to or contemporaneous with the 2016 Agreement which gave DDS's the right to demand such a product. Thus, as DDS's contends, its contract claims do not originate from or "arise out of" the APA.

This is not the end of the matter, however, because the forum selection clause also includes the words "relating to," which may encompass DDS's contract claims.

The import of the term "relating to" is broader in scope than the phrase "arising out of." *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 99 n.50 (3d Cir. 2018). Black's Law Dictionary defines the word "related" as "1. Connected in some way." Black's Law Dictionary 102 (11th ed. 2019). This definition suggests the term "related to," unlike the phrase "arising out of," is not necessarily tied to the concept of a causal connection. Instead, there just needs to be an association with or reference to the applicable subject. S*ee Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001). [1] Courts have also given the term "related to" a capacious interpretation. In interpreting the scope of 28 U.S.C. § 1334(b), the Third Circuit

---

[1] In light of the Third Circuit's admonition that "drawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue," we look to the decisions of other circuit court of appeals that have construed the phrase "relating to" in a forum selection clause. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 98 (3d Cir. 2018).

11

explained that the reach of "related to" jurisdiction is extremely broad, extending to any action the outcome of which "could conceivably have any effect on the estate being administered in bankruptcy." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1075 (3d Cir. 1997) (citing *Pacor v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984)).

From the plain meaning of the term "related to," it is manifestly apparent that DDS's contract claims fall within the scope of the forum selection clause as a court cannot resolve the contract dispute without first determining whether DDS's claims were waived by the APA's release provisions. The Third Circuit's decision in *John Wyeth* further buttresses this conclusion. *John Wyeth & Bro. Ltd. v. CIGNA Intern. Corp.*, 119 F.3d 1070, 1073 (3d Cir.1997).

In that case, an English pharmaceutical company, Wyeth, entered into an agreement ("the 1990 Agreement") with two insurance companies, CIGNA and GRE, to pay a portion of its defense costs from various product liability lawsuits. *Id.* at 1072. The 1990 Agreement included a forum selection clause which provided that English courts had exclusive jurisdiction over "any dispute arising under or out of or in relation to this Agreement." *Id.* at 1073. After GRE tendered the aggregate amount of the limits of its coverage, Wyeth brought suit in the Eastern District of Pennsylvania alleging CIGNA was required to pay for all unreimbursed defense costs. *Id.* CIGNA countered that the district court lacked jurisdiction over the suit due to the forum selection clause. *Id.* On appeal, the Third Circuit concluded the District Court did not err in granting summary judgment because the origin of the dispute was related to the 1990 Agreement, i.e., it had some logical connection. *Id.* at 1074. It reasoned there was a logical connection between the parties' dispute and the 1990 Agreement because CIGNA contended the Agreement, which stated the payments were made as a compromise and accord, barred Wyeth's

12

claims. *Id.* at 1076. In other words, the Court concluded the dispute was related to the Agreement because CIGNA raised it as a defense to Wyeth's claims. *Id.*

The dispute here is analogous to the dispute in *Wyeth*. In response to DDS's contract claims, Amcor is raising the APA and its release provisions as a defense. More precisely, Amcor contends, like CIGNA did, that DDS's claims are barred by the release provisions in the APA because they allegedly waived any claims arising out of the parties contractual relationship with respect to the subject long neck tube product. Whatever the merits of this contention, it demonstrates there is, at a minimum, a connection between the APA and the parties' dispute. This is because logically, before a court could even consider the merits of DDS's claims, it would need to determine whether they were waived by the release provisions in the APA. The fact that this antecedent analysis is *logically* necessary shows there is a logical connection between the dispute and the APA. Thus, just like CIGNA's use of the 1990 Agreement as a defense in *Wyeth*, Amcor's use of the APA and its release provisions as a defense shows the current dispute is "related to" the APA.

In fact, Amcor's burden of establishing that the dispute is "related to" the APA is presumably even easier to satisfy than it was in *Wyeth* given that the term "related to" is arguably broader than the term "arising in relation to." At bottom, because of the expansive interpretation of the term "related to," it cannot be gainsaid that DDS's contract claims are "connected *in some way*" to the APA and its release provisions.

Although DDS asserts the APA is irrelevant because the release provisions waived only those claims arising under the 2015 MOU and its claims are brought exclusively under the 2016 Agreement, this goes to the merits of the dispute—an issue not before this Court. Again, *Wyeth* is instructive on this point.

13

Sometimes cases stand not only for what they say, but also for what they do not say or do not do. In *Wyeth* there was no analysis on whether CIGNA raised a valid accord and satisfaction defense to the claims. This was intentional. No analysis was needed because that ruling would have been one on the merits, which was not before the court. The same is true here. We need not decide whether DDS's contract claims under the 2016 Agreement are separate and distinct from the 2015 MOU. That goes to the merits and it not necessary to resolve this dispute. At this stage of the proceeding, it is sufficient that Amcor raises as its defense the release provisions in the APA and that DDS's claims are arguably related to those provisions. Accordingly, we find that DDS's contracts claims fall within the scope of the forum selection clause in the APA.

### B. Enforceability of Forum Selection Clause

In a diversity case, the enforceability of a forum selection clause is governed by federal law. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995). This is because "questions of venue and the enforcement of forum selection clauses are essentially procedural, rather than substantive, in nature." *Id.* As such, application of federal law to forum selection clauses in diversity cases does not run afoul of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). *Id.*

Under federal standards, a forum selection clause is "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991). A forum selection clause is "unreasonable" where the defendant can make a "strong showing" either that: (1) it is the result of fraud or overreaching; or (2) enforcement would in the particular circumstances of the case result in jurisdiction so seriously inconvenient it would for all practical purposes deprive defendant of his day in court. *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991).

14

Although Plaintiff intimates there is an inequality of bargaining power, there is no explicit argument that the forum selection clause is the result of fraud or overreaching or that it would deprive Plaintiff of his day in court. It appears these suggestions of overreaching are more for optics than an attempt at undermining the "reasonableness" of the forum selection clause. Therefore, this Court finds no reason to question the validity of the forum-selection clause.[2]

The mainstay of Plaintiff's argument is whether the forum selection clause is mandatory. There are two types of forum selection clauses—permissive and mandatory. *Cancer Genetics, Inc. v. Kreatech Biotechnology*, B.V., No. CIV.A. 07-273(JAG), 2007 WL 4365328, at *4 (D.N.J. Dec. 11, 2007). A mandatory forum selection "identifies a particular state or court as having exclusive jurisdiction over disputes arising out of parties' contract and their contractual relationship." *Asphalt Paving Sys., Inc. v. Gen. Combustion Corp.*, No. CIV.A. 13-7318 JBS, 2015 WL 167378, at *5 (D.N.J. Jan. 13, 2015). Words of exclusion or authority, such as "exclusive," "sole," "shall," "only," or "must" are indicia of a mandatory forum selection clause. A permissive forum selection clause, by contrast, "merely specifies the court empowered to hear litigation," and, in effect "allows parties to air any dispute in that court without requiring them to do so." *Int'l Bus. Software Solutions, Inc. v. Sail Labs Tech.*, 440 F.Supp.2d 357, 363 n.2 (D.N.J.2006).

Plaintiff misses the mark on this argument. It contends the forum selection clause in the 2015 MOU is permissive but that is not the relevant agreement. It is the forum selection clause in the APA that we are construing. But even if DDS hit the mark, it is beyond refute that the forum

---

[2] A forum selection clause need not be the result of arm's length negotiations so long as the clause is fundamentally fair. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (holding that forum selection clauses must be scrutinized for "fundamental fairness," and may be deemed unfair if inclusion of the clause was motivated by bad faith, if "accession to the forum clause" was obtained "by fraud or overreaching.").

selection clause in the APA is mandatory. The clause provides "[a]ll disputes arising out of or relating to this Agreement will be subject to the *exclusive* jurisdiction and venue in the federal courts of the State of Michigan, to which the Parties irrevocably submit." (emphasis added). The word "exclusive" plainly establishes the federal courts of the State of Michigan as the only jurisdiction in which issues relating to the APA can be litigated. As there is no reasonable alternative interpretation of this provision, the Court concludes it is mandatory.

Nevertheless, in order to determine whether transfer is warranted, the Court must still engage in a modified § 1404(a) analysis.

### C. The Applicable § 1404(a) Considerations Weigh in Favor of Transfer

To understanding the inter-play between forum selection clauses and motions to transfer under § 1404(a), we begin with a review of the legal principles governing the § 1404(a) transfer analysis in the absence of a forum-selection clause.

In deciding whether to grant a § 1404(a) transfer, courts consider various private and public interests. *Asphalt Paving Sys. v. Gen. Combustion Corp.*, No. 13-7318 (JBS/KMW), 2015 U.S. Dist. LEXIS 3494 at *16 (D.N.J. Jan. 13, 2015). The balancing of these interests is in the district courts' discretion. *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 401 (3d Cir. 2017). But there is an enumeration of factors to be balanced in each case. *Park Inn Int'l, L.L.C. v. Mody Enters.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000).

The private interests to be balanced relate to the convenience of the parties and witnesses. *Id.* They include: (1) the plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses;

and (6) the location of books and records, as well as other practical problems that make trial of a case easy, inexpensive, and expeditious. *Id.*

In contrast, the public interests to be balanced derive from the interests of the justice. *Id.* These interests include: (1) the enforceability of the judgment; (2) the relative administrative difficulty in the two fora resulting from court congestion; (3) the local interest in deciding local controversies at home; (4) the public policies of the fora; and (5) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.*

The balancing of the private and public interests under § 1404(a) changes, however, if a forum-selection clause enters the picture. In *Atlantic Marine*, the Supreme Court clarified that "the presence of a valid forum selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63, 134 S. Ct. 568, 581, (2013). First, district courts must give no weight to the plaintiff's choice of forum; rather the party defying the forum selection clause bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted. *Id.* Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause must deem the private interest factors to weigh entirely in favor of the preselected forum. *Id.* at 582. Third, and as a logical consequence of the second change, a district court may consider arguments about public interest factors only. *Id.* The Supreme Court explained that, with these modifications, district courts should enforce valid forum selection clauses "in all but the most unusual cases."

In considering whether such extraordinary circumstances exist, a court may consider "arguments about public interest factors only," including "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and]

the interest in having the trial of a diversity case in the forum that is at home with the law." *Atl. Marine*, 134 S.Ct. at 581. The public interest factors must "overwhelmingly disfavor a transfer to overcome the forum selection clause." *Id.* at 583.

Plaintiff, as the party defying the forum selection clause, bears the heavy burden of establishing that the situation is "extraordinary" because of public interest factors. Plaintiff's attempt to meet this burden falls short. It concedes that the enforceability of a subsequent judgment in either forum, the relative public policies of each forum, and the familiarity of the trial judgment with the applicable state law are all neutral factors that do not militate in favor of one forum. Rather, Plaintiff's argument as to why this Court should deny Amcor's motion to transfer rests on the single factor that this is a local controversy and thus there are local interests in having the dispute decide at home. The Court recognizes the present dispute may implicate local interests because both DDS and Amcor have facilities located in New Jersey, but the local interests equally support Michigan as well. Michigan is the home to Amcor's headquarters and thus it has an interest in regulating and protecting its businesses just as much as New Jersey does.

In sum, the relevant public interest factors in the Court's § 1404(a) analysis are neutral. In light of Plaintiff's heavy burden and the fact that the public interest factors stand in equipoise, Plaintiff has not met its burden to show that transfer to Michigan is unwarranted.

### D. Motions to Seal

Defendant Amcor moves to seal Exhibits A and D to its Motion to Transfer (Doc No. 20) and Plaintiff DDS moves to seal Exhibit A to its Motion in Opposition to Transfer (Doc. No. 25). Both parties have met their burden.

Exhibit A and D to Defendant's Motion to Transfer are copies of the 2015 MOU and the APA. Exhibit A to Plaintiff Motion in Opposition to Transfer is an email relating to the

underlying business transaction between Amcor and DDS, Amcor's price quotation, and a copy of the 2016 Agreement. The nature of these materials are commercially sensitive business information as they include prices, price quotes, and the contents of specific contract provisions, which if made public, would affect both Defendant and Plaintiff's ability to compete for and negotiate competitive contracts of similar kind. In fact, the parties' contracts contain express confidentiality provisions.

Plaintiff and Defendant have a legitimate interest in protecting this private and confidential business information from disclosure because they would be at a competitive disadvantage when negotiating future contracts and business relationships if the contractual provisions or prices were publicly disclosed. *See e.g., China Falcon Flying Ltd. v. Dassault Falcon Jet Corp.*, No. 15-cv-6210, 2017 U.S. Dist LEXIS 138651, at *6–7 (D. N.J. Aug. 29, 2017) (legitimate private interest in commercial information and maintaining competitiveness and competitive standing).

The type of harm Plaintiff and Defendant would face if the sealing request were denied is sufficient to constitute "good cause" to seal. Should the public be given access to these documents, competitors would gain insight into Plaintiff and Defendant's pricing strategies and could leverage this knowledge to compete more effectively.

Moreover, there is no less restrictive alternative to sealing Defendant's Exhibits A and D and Plaintiff's Exhibit A as these documents contain confidential business information. Ultimately, then, Plaintiff and Defendant have satisfied the standards set forth in Local Civil Rule 5.3(c) and established good cause to seal these Exhibits.

**IV.  CONCLUSION**

Based on the foregoing, the Court will grant Defendant's motion to transfer this case to the United States District Court for the Eastern District of Michigan. An appropriate Order will accompany this Opinion.

Dated: 10/26/2020          s/ Robert B. Kugler
         ROBERT B. KUGLER
         United States District Judge